STATE OF NORTH CAROLINA v. CARNELL TYRONE STREATER

No. COA08-961

(Filed 7 July 2009)

**1. Sexual Offenses— expert testimony—sexual abuse by defendant—opinion on victim's credibility—plain error**

A pediatrician's testimony in a prosecution for first-degree sexual offense that his findings were consistent with "the history that [he] received from [the victim]" of repeated anal penetration by defendant constituted an improper opinion on the victim's credibility and amounted to plain error where the pediatrician testified that there was no physical evidence of anal penetration; the victim's medical history as testified to by the pediatrician presented an unclear evidentiary foundation for the pediatrician's conclusion that defendant, rather than one of the other men the victim referred to as "dad," was the perpetrator of the sexual offense; and the victim's testimony was the only direct evidence implicating defendant as the perpetrator of the sexual offense.

**2. Evidence— expert testimony—sexual abuse victim's physical condition consistent with history**

The trial court did not err in a first-degree statutory rape case when it admitted an expert's testimony that the victim's physical condition was consistent with her history because: (1) the doctor was qualified as an expert in the field of pediatrics, the expert testified that the victim's history of repeated vaginal penetration was consistent with his findings made during his examination of the victim, and his testimony was not impermissible opinion testimony regarding the victim's credibility since the expert's previous testimony established the existence of physical evidence supporting a diagnosis of sexual intercourse; and (2) once the trial court accepted the doctor as an expert, controversy over his opinion goes to the weight of his testimony and not its admissibility.

**3. Evidence— child abuse investigator—victim's interview at DSS**

The trial court did not commit plain error in a first-degree sexual offense and first-degree rape case by allowing a child abuse investigator's testimony about the victim's interview at DSS

because: (1) the investigator did not testify as an expert; (2) the investigator did not render an opinion that sexual abuse had occurred; and (3) the investigator merely explained her usual protocol in forensic interviews and stated she thought the first portion of the interview was sufficient to support the allegations contained in the protective services report.

**4. Evidence— victim's testimony—truthfulness—swore to Jesus**

Although the trial court erred in a first-degree sexual offense and first-degree rape case by admitting the victim's testimony that she told the truth and swore to Jesus regarding her previous testimony, it did not amount to plain error because it cannot be said that the victim's testimony tilted the scales and caused the jury to reach its verdict convicting defendant of first-degree rape in light of the remainder of the victim's testimony, the physical evidence of vaginal penetration presented by a doctor, and the victim's prior consistent statements made to a child sex abuse investigator.

**5. Evidence— prior crimes or bad acts—incarceration—drug use—non-sexual physical assault of a victim**

The trial court did not commit plain error in a first-degree sexual offense and first-degree rape case by admitting into evidence a witness's testimony concerning defendant's prior bad acts including incarceration, drug use, and non-sexual physical assault of a victim because: (1) although the trial court erred when it admitted a witness's testimony that defendant was previously incarcerated and used marijuana while living with the witness and the victim since this evidence came before defendant placed his credibility at issue by testifying, it cannot be said that absent the error the jury probably would have reached a different verdict in light of other similar evidence properly admitted at trial; and (2) the testimony concerning a "whooping" incident tended to show the victim began wetting the bed around the time of the alleged sexual abuse and was properly admitted to establish defendant's intent to conceal the alleged sexual abuse.

**6. Constitutional Law— effective assistance of counsel—dismissal without prejudice to file motion for appropriate relief**

Although defendant contends he received ineffective assistance of counsel in a first-degree sexual offense and first-degree

rape case based on his counsel's failure to object at trial, this assignment of error is dismissed without prejudice to allow defendant to file a motion for appropriate relief with the trial court because the trial court is in a better position to determine whether counsel's performance was deficient and prejudiced defendant.

**7. Sentencing— consolidated—remand for resentencing— new trial awarded on one of charges**

A first-degree sexual offense and first-degree rape case was remanded for resentencing on defendant's first-degree rape conviction because: (1) the trial court consolidated defendant's convictions; and (2) defendant was awarded a new trial on the charge of first-degree sexual offense.

Appeal by defendant from judgment entered on 21 February 2008 by Judge Mark E. Klass in Davidson County Superior Court. Heard in the Court of Appeals 28 January 2009.

*Attorney General Roy Cooper, by Assistant Attorney General Elizabeth F. Parsons, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel R. Pollitt, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Carnell Tyrone Streater ("defendant") appeals from judgment entered after a jury found him guilty of: (1) first-degree sexual offense pursuant to N.C. Gen. Stat. § 14-27.4(a) and (2) first-degree rape pursuant to N.C. Gen. Stat. § 14-27.2(a). We award defendant a new trial on his first-degree sexual offense charge, hold there to be no error in his first-degree rape conviction, and remand for resentencing on the first-degree rape conviction.

## I. Background

Defendant was indicted for first-degree statutory sexual offense and first-degree statutory rape on 13 March 2006. The indictments alleged that "between the 1st day of October, 2004 and the 31st day of March, 2005" defendant engaged in a sex offense and vaginal intercourse with B.H.S. (hereinafter "B.H.S." or "the victim").

The State's evidence showed that B.H.S. was born on 7 October 2000. When B.H.S. was age four she was living with her parents,

defendant and Rosanna Nicole Bacon ("Bacon"). At this time, defendant was unemployed and "watched" B.H.S. while Bacon worked at a dance club about five nights a week from approximately 5:30 p.m. to 4:00 a.m. She testified while Bacon was at work, defendant "would do things [she] didn't like," on her "bed." Defendant would put "[h]is private" inside of the victim's "[f]ront and back" privates, and doing these acts "hurt" her front and back parts. She testified that she would tell him to stop, but he did not. B.H.S. further testified that defendant told her he "would ground [her]" if she told anyone. B.H.S. did not tell Bacon about these events because she "felt scared to" tell. She testified the acts stopped around October of 2005, when Bacon "wanted [B.H.S.] to go stay with [B.H.S.'s] aunt and uncle so [Bacon] could get [her]self together . . . ."

On cross-examination, B.H.S. testified she first told her aunt and uncle about these events. She further testified that the acts caused a "mess" on sheets which were changed by Bacon. At trial she testified that she called Bobby and Boyd, two friends of her mother who lived with them, "daddy" and would also call her uncle "daddy," but none of the other men she called "daddy" touched her, and that the person who touched her was defendant.

Bacon testified that she, B.H.S., and defendant lived together from "the time period around her fourth birthday" until March 2005 when defendant had a stroke. During the period of time in which the events B.H.S. complained of, and afterward, two other men, Boyd and Bobby, lived in the house with Bacon and B.H.S. Both Boyd and Bobby "watched" B.H.S. Bacon testified that during this period of time she used cocaine supplied by Bobby, and defendant used marijuana. She also testified during the period of time she lived with defendant, B.H.S. did not report to her that defendant touched her, and that she did not notice anything or suspect anything. Bacon testified that defendant had a stroke in March and lived in a hospital and nursing home. After leaving the nursing home, he returned to her home.

On 12 October 2005, Bacon signed an agreement relinquishing custody of B.H.S. to Bacon's brother George and his wife. Their agreement provided for return of the victim to Bacon conditioned upon her giving up cocaine and dancing.

The Alamance County Department of Social Services ("DSS") received a Protective Services Report regarding B.H.S. on 27 January 2006. The custodial aunt brought B.H.S. to DSS's interview facility on

30 January 2006. At the interview, B.H.S. described defendant's actions to DSS's child abuse investigator Leslie Jones ("Jones"). B.H.S. drew anatomical pictures of herself and described defendant's genitals. Her pictures also showed urine and blood on the bed.

Lieutenant Weidner of the Thomasville Police Department testified that he conducted an investigation of B.H.S.'s report which included seizing a mattress from the residence of Bacon. After being tested by the SBI, there were no findings of bodily fluids present.

At DSS's request, Dr. Joseph Pringle, Jr. ("Dr. Pringle") examined B.H.S. on 3 February 2006. At trial Dr. Pringle was qualified without objection as an expert in the field of pediatrics. The prosecutor notified the court at the time of Dr. Pringle's testimony that Dr. Pringle was "obviously extremely busy" and was specially scheduled to testify at 2:00 p.m. on 20 February 2008. His direct examination with regard to the history given him by the victim is as follows:

Q During the time period in which you spoke with [B.H.S.], do you recall any specific comments she made to you in reference to the allegations?

A Yes. She was calm during the interview process and stated to me that her dad—and she did not name a name—but she called and said her dad and she used the word weeny for penis, stuck his weeny in both her front and back areas and on her bottom and it hurt. And at times there was some bleeding after the event occurred and she said it happened many times. She didn't give me a number of times . . . .

* * * *

Q Explain to the ladies and gentlemen what a physical examination or that part of the evaluation entails.

A It is a physical examination in child sexual or physical abuse cases. We are looking for signs of trauma such as bruises, burns, scars and lacerations. In sexual abuse cases as alleged here, we are looking for signs of any changes in the anatomy of the genital area that might have been caused by trauma or signs of infection such as vaginal discharge or bleeding for an accute (sic) event.

Q In your experience and in the literature that's published in this field, when you go in for these examinations, regardless of the history that you receive from the child making the allegations, do you expect to make findings, generally?

A Many times in sexual abuse cases there are no residual findings in the genital area that will say yes or no to this, that the abuse did or did not occur. It is not uncommon to have the abuse alleged and have a normal genital examination.

Q Is there any reason why you expect that other than the literal take says that, is there any particular experience you have in that area of the human body causes you to believe that?

A It could be the degree of trauma involved. If it was minor trauma, it wouldn't show anything. If the tissues are stretchy, they give or take. They may just stretch and spring back to normal if there's no laceration or abruption or tearing of the tissues at all. There was no evidence of discharge here either so—

Q Thank you. I appreciate you answering that question. That's in general?

A In general.

Dr. Pringle explained the procedures he used to examine the victim and that he conducted a full examination of the victim's vaginal and anal openings. He testified the victim's "vaginal opening was abnormal in several ways[:]" (1) "it was slightly larger than . . . a child of her age[;]" (2) "there w[ere] deep notches at the upper part of the vaginal opening . . . at 10:00 o'clock and 2:00 o'clock[;]" and (3) "[t]here was also a small scar just inside the rim of the vaginal opening that looked like a healed laceration . . . ." Dr. Pringle stated this was a "significant finding." The examination of Dr. Pringle continued as follows:

Q Would you find that based on the history that we already covered, [the victim's] statements that the defendant did penetrate her with his penis on many occasions, would you find that that is consistent with a finding of two deep notches in the vaginal tissue?

A Yes, I would think so. The penetration split the opening at the margins of the vaginal opening and created the tears that resulted in these notches as they healed.

After explaining the formation of scar tissue, the examination continued as follows:

Q Again, based on the history that you received from [B.H.S.], repeated penile intercourse by the defendant, did you find that's consistent with that history?

A Yes, I believe so. It was not a normal finding.

Q Taking that and moving to the next part of that examination, you also had a history from [B.H.S.], as you indicated in your testimony, of anal penetration by the defendant's penis; is that correct?

A That is correct.

Q After you finished your vaginal examination did you examine her anal area?

A Yes, I did.

\* \* \* \*

Q And in reviewing of the examination of [B.H.S.] at that time, did you make any significant findings there?

A No. I thought her anal opening looked normal in her size, shape and caliber. There was no hemorrhoids or fissures or splits in the anal wall. It looked normal.

Q Based on the history that you received from [B.H.S.], potentially repeated penetration of the defendant's penis into the anal area, would you find that inconsistent with your medical findings of no trauma or would you find that consistent with it?

A I think it was consistent with the findings. She may not, despite having been anally penetrated, she may not have had any physical findings. In many cases it is common to have a normal exam even after an allegation of physical sexual abuse in that area.

Dr. Pringle indicated that there were no other allegations made by the victim other than those indicated. Defendant testified in his own defense and denied the charges. On 21 February 2008, a jury found defendant guilty of first-degree sexual offense and first-degree rape. The trial court determined defendant to be a prior record level III offender, consolidated the convictions, and sentenced him to a minimum of 269 and a maximum of 332 months' incarceration. Defendant appeals.

## II. Issues

Defendant argues the trial court committed plain error when it admitted: (1) Dr. Pringle's expert testimony that "sexual abuse" had in fact occurred; (2) Dr. Pringle's expert testimony that defendant's repeated penetration of the victim with his penis was consistent with

her history and bolstered the victim's credibility; (3) Dr. Pringle's expert testimony that the presence and absence of physical findings were both consistent with the victim's history; (4) Jones's testimony about the credibility and sufficiency of the victim's initial DSS interview; (5) the victim's testimony about the truthfulness of her testimony; and (6) evidence of defendant's prior bad acts. Defendant also argues he received ineffective assistance of counsel.

### III. Standard of Review

Because defendant failed to object or move to strike this testimony, we must determine whether these evidentiary errors amounted to plain error.

When an issue is not preserved in a criminal case, we apply plain error review. *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996). We find plain error

> only in exceptional cases where, "after reviewing the entire record, it can be said the claimed error is a " *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.' " Thus, the appellate court must study the whole record to determine if the error had such an impact on the guilt determination, therefore constituting plain error.

*State v. Davis*, 349 N.C. 1, 29, 506 S.E.2d 455, 470 (1998) (citations omitted), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). Accordingly, we must determine whether the jury would probably have reached a different verdict if this testimony had not been admitted. *See State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987) (explaining that "plain error" is error "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached"), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988); *State v. Hammett*, 361 N.C. 92, 637 S.E.2d 518 (2006).

### IV. Dr. Pringle's Testimony

[1] Defendant argues he is entitled to a new trial in the sex offense conviction because Dr. Pringle's expert opinion evidence that sexual abuse had in fact occurred was plain error. In addition, defendant argues that he is entitled to a new trial on both cases because Dr. Pringle's evidence that the victim's physical condition was consistent with her testimony that it was defendant who had repeatedly penetrated her with his penis and that the presence and absence of physi-

cal findings were both consistent with the victim's history. We agree with defendant with regard to the sexual abuse conviction but disagree with defendant with regard to the rape conviction.

Our consideration of these issues is governed by *State v. Stancil*, 355 N.C. 266, 559 S.E.2d 788 (2002); *Hammett*, 361 N.C. 92, 637 S.E.2d 518; *State v. Aguallo*, 322 N.C. 818, 370 S.E.2d 676 (1988); and *In re Butts*, 157 N.C. App. 609, 582 S.E.2d 279 (2003), *disc. review improvidently allowed, appeal dismissed*, 358 N.C. 370, 595 S.E.2d 146 (2004), and their progeny. We are also mindful that application of the evidentiary principles established by these cases are *sui generis* involving a fact intensive analysis of the testimony involved. There is a fine line between permissible and impermissible expert testimony and its effects on the jury's result.

We find plain error in the sex abuse conviction based upon our analysis of the following factors and their cumulative effects on the jury result in that specific conviction. These factors include (1) the presence of ordinary evidentiary error which, if an objection had been lodged, should have been sustained; (2) the ambiguous testimony of Dr. Pringle as to which of the two charges his testimony was directed toward with regard to the allegations of "sexual abuse"; (3) the victim's medical history as testified to by Dr. Pringle, presenting an unclear evidentiary foundation for the conclusion by Dr. Pringle that defendant, rather than one of the other men the victim called "Dad," was the perpetrator of the sexual abuse; (4) the likelihood that Dr. Pringle's opinion bolstered the victim's credibility with regard to the sexual abuse case and its probable impact on the jury; (5) the lack of a curing instruction with regard to the evidence which could be considered by the jury in the sexual abuse conviction; and (6) lack of any corroborative testimony or physical evidence, which was not derived from the child's testimony, that sexual abuse (as opposed to rape) had in fact occurred.

*State v. Stancil*, 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002) holds:

> In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility.

*See also, State v. Trent*, 320 N.C. 610, 614-15, 359 S.E.2d 463, 465-66 (1987); *State v. Grover*, 142 N.C. App. 411, 543 S.E.2d 179, *aff'd per*

*curiam,* 354 N.C. 354, 553 S.E.2d 679 (2001). However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith. *State v. Hall,* 330 N.C. 808, 818, 412 S.E.2d 883, 888 (1992); *Aguallo,* 322 N.C. at 822-23, 370 S.E.2d at 678; *State v. Kennedy,* 320 N.C. 20, 32, 357 S.E.2d 359, 366 (1987).

N.C. Gen. Stat. § 8C-1, Rule 702 (2007), provides:

**Testimony by experts.**

(a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

The proper foundation is a predicate to the admission of expert opinion. In a sex abuse case, a physical examination and an interview with the victim can lay the proper foundation for expert testimony.

Prior to Dr. Pringle's testimony, testimony from the victim and Bacon showed that the victim referred to as many as four men by the name of "daddy." In his direct testimony, Dr. Pringle, in reporting history given by the victim, "dad," and "she did not give a name," was the perpetrator of both the vaginal and anal penetration. Subsequently, Dr. Pringle testified "in general" that physical findings are not always present in sex abuse cases. This conclusion was proper testimony and provided the needed evidence for the State.

Nonetheless, the State examined Dr. Pringle with leading questions which did not have the predicate foundation. The questions assumed a fact not in evidence from Dr. Pringle's history—that the man the victim named as "dad" and defendant were the same person. The impact of this questioning could not be for the purpose of clarifying for the jury the fact that sexual abuse can occur in the absence of physical findings. Prior to that question being lodged, Dr. Pringle had testified that physical findings of abuse were not always present in sex abuse cases. The impact of this line of questions was not only to bolster the credibility of defendant but to resolve the issue for the jury that the victim had specifically identified defendant as the perpetrator during her case history, which was directly contrary to Dr. Pringle's earlier testimony. The leading questioning repeatedly made this connection without proper foundation.

While Dr. Pringle could give such testimony with regard to vaginal rape, where he found "significant" findings of physical evidence to support the charge history, he cannot testify that it was defendant who repeatedly abused the victim where no such physical evidence exists. He could testify that the physical findings could be present even where there was repeated penetration, but it is the specific identification of defendant as perpetrator which crosses over the line into impermissible testimony.

Here, following Dr. Pringle's testimony, the prosecutor questioned Dr. Pringle:

Q  Can you explain to the ladies and gentlemen when you have a history as described by [the victim] and you moved to examine the anus what would you be looking for as far as that part of the body is indicated?

A  We are looking for a natural laxity, gaping anal opening caused by a breakdown of the anal sphincter muscle that would result in an anal laxity with a breakdown of the anal sphincter. We would look for fresh lacerations or tears if they were recently created.

Q  And in reviewing of [sic] the examination of [the victim] at that time, did you make any significant findings there?

A  No. I thought her anal opening looked normal in her [sic] size, shape and caliber. There [were] no hemorrhoids or fissures or splits in the anal wall. It looked normal.

Q  Based on the history that you received from [the victim], potentially repeated penetration of the defendant's penis into the anal area, would you find that inconsistent with your medical findings of no trauma or would you find that consistent with it?

A  I think it was consistent with the findings. She may not, despite having been anally penetrated, she may not have had any physical findings. In many cases it is common to have a normal exam even after an allegation of physical sexual abuse in that area.

Dr. Pringle testified that there was no physical evidence of anal penetration. The trial court therefore erred when it admitted Dr. Pringle's testimony that his findings were consistent with "the history that [he] received from [the victim]" of repeated anal penetration by defendant. "[S]uch testimony [was] an impermissible opinion regarding the victim's credibility." *Stancil*, 355 N.C. at 266-67, 559 S.E.2d at 788.

STATE v. STREATER

[197 N.C. App. 632 (2009)]

Here, the jury had only the testimony of the victim and testimony by investigators that the victim had repeated the same evidence to them at an earlier time. The victim's testimony was the only direct evidence implicating defendant on the charge of first-degree sexual offense. Dr. Pringle's testimony amounted to an improper opinion on the victim's credibility, and it had a probable impact on the jury's result. *See State v. O'Connor*, 150 N.C. App. 710, 712, 564 S.E.2d 296, 297 ("[B]ecause there was no physical evidence of abuse and the State's case was almost entirely dependent on J.M.'s credibility with the jury, the admission of Dr. Brown's statement was plain error."), *disc. review denied*, 356 N.C. 173, 567 S.E.2d 144 (2002); *State v. Couser*, 163 N.C. App. 727, 731, 594 S.E.2d 420, 423 (2004) ("We conclude that the impermissible expert medical opinion evidence had a probable impact on the jury's result because it amounted to an improper opinion on the victim's credibility, whose testimony was the only direct evidence implicating defendant."). Defendant is entitled to a new trial on the charge of first-degree sexual offense. In light of this holding, we review defendant's remaining assignments of error only as they relate to his first-degree rape conviction.

**[2]** Defendant's remaining arguments with regard to Dr. Pringle's testimony are that the trial court erred when it admitted Dr. Pringle's testimony that the victim's physical condition was consistent with her history and found that this testimony was not helpful to the jury. We disagree.

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C. Gen. Stat. § 8C-1, Rule 702(a). "[O]nce the trial court makes a preliminary determination that the scientific or technical area underlying a qualified expert's opinion is sufficiently reliable (and, of course, relevant), any lingering questions or controversy concerning the quality of the expert's conclusions go to the weight of the testimony rather than its admissibility." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 461, 597 S.E.2d 674, 688 (2004) (citation omitted).

Here, Dr. Pringle was qualified as "an expert in the field of pediatrics." Dr. Pringle testified that the victim's history of repeated vaginal penetration was consistent with his findings made during his examination of the victim's vaginal opening. This testimony was not impermissible opinion testimony regarding the victim's credibility

because Dr. Pringle's previous testimony established the existence of physical evidence supporting a diagnosis of sexual intercourse. *Stancil,* 355 N.C. at 266-67, 559 S.E.2d at 789. Once the trial court accepted Dr. Pringle as an expert, controversy over his opinion goes to the weight of his testimony, not its admissibility. *Howerton,* 358 N.C. at 461, 597 S.E.2d at 688. The trial court did not err when it allowed Dr. Pringle to testify that his physical findings were consistent with the victim's history. These assignments of error are overruled.

## V. Jones's Testimony

[3] Defendant argues the trial court committed plain error when it allowed Jones's testimony about the victim's interview at DSS "because it was 1) opinion evidence a legal standard had been met, and 2) evidence on [the victim's] credibility." We disagree.

Jones testified that as a child abuse investigator she conducts forensic interviews of children to determine "whether the allegations [contained in the Protective Services Report] are true or false." After playing a portion of the videotaped interview of the victim for the jury, the following exchange occurred between the prosecutor and Jones:

Q During this part of the video you and [the victim] are out of the room; is that correct?

A Yes.

Q Where did you go?

A I walked up with [the victim] where there was another play area and walked back down the hall.

Q Did you meet with anybody at that time?

A I spoke with Detective Kelly.

* * * *

Q What was the topic of your discussion? Don't say what anybody else said, but what did you talk about?

A Detective Kelly and I talked about was there any additional information or any other questions that need to be asked.

Q Is that normal protocal [sic] that you take a break and ask if there's any other questions that anybody needs to ask?

A Right.

\* \* \* \*

Q What did you tell [Detective Kelly] about what was [sic] the answers of the child?

A I felt from that interview there was enough.

Q For the allegations?

A For the allegations on the report.

Defendant correctly notes that in *State v. Parker*, our Supreme Court stated:

> *An expert* may not testify regarding whether a legal standard or conclusion has been met "at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the witness." Testimony about a legal conclusion based on certain facts is improper, while opinion testimony regarding underlying factual premises is allowable.

354 N.C. 268, 289, 553 S.E.2d 885, 900 (2001) (citations omitted) (emphasis added), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). *Parker* is not applicable here, however, because Jones did not testify as an expert. More importantly, Jones did not render an opinion that sexual abuse had occurred. Jones merely explained her usual protocol in forensic interviews and stated she thought the first portion of the interview was sufficient to support the allegations contained in the Protective Services Report. The trial court properly allowed Jones's testimony. This assignment of error is overruled.

## VI. The Victim's Testimony

[4] Defendant argues the trial court committed plain error when it admitted the victim's testimony "that she 'told the truth' and 'swore to Jesus[.]' " We disagree.

"The question of whether a witness is telling the truth is a question of credibility and is a matter for the jury alone." *State v. Solomon*, 340 N.C. 212, 221, 456 S.E.2d 778, 784, *cert. denied*, 516 U.S. 996, 133 L. Ed. 2d 438 (1995). "Therefore . . . it is improper for . . . counsel to ask a witness (who has already sworn an oath to tell the truth) whether he has in fact spoken the truth during his testimony." *State v. Chapman*, 359 N.C. 328, 364, 611 S.E.2d 794, 821 (2005).

In *Chapman,* our Supreme Court stated:

[T]he error cited by [the] defendant involve[d] the prosecutor's questions to the State's witness after that witness's credibility had been attacked. Moreover, [the] defendant did not object to the prosecutor's questions concerning [the witness's] truthfulness at trial; thus, [the] defendant must show plain error to prevail on appeal. As stated earlier, plain error is error " 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " After thorough review of the record, we cannot say that [the witness's] responses probably altered the outcome of the trial.

359 N.C. at 364, 611 S.E.2d at 821 (citations omitted).

Here, the following exchange occurred between the prosecutor and the victim at the end of the victim's direct examination:

Q  Now, earlier when you came up to the witness stand and Judge Klass had you put your hand on the Bible and swear that you would tell the truth, do you understand what that meant?

A  Yes.

Q  When you put your hand on the Bible, who were you swearing you were going to tell the truth to?

A  Jesus.

Q  Have you told the truth to these folks here today?

A  Yes.

Like *Chapman,* the error cited by defendant involves the prosecutor's questions to the State's witness. Unlike *Chapman* however, the victim's credibility had not been attacked on cross-examination. The victim's ability to tell the truth was questioned only during *voir dire.* The trial court erred when it allowed the victim's testimony about the truthfulness of her previous testimony. *Id.*

In light of the remainder of the victim's testimony, the physical evidence of vaginal penetration presented by Dr. Pringle, and the victim's prior consistent statements made to Jones, we cannot say that the victim's testimony " 'tilted the scales' and caused the jury to reach its verdict convicting . . . defendant" of first-degree rape. *Walker,* 316 N.C. at 39, 340 S.E.2d at 83. Likewise, we cannot say the victim's tes-

timony that she swore she was going to tell the truth to "Jesus" probably altered the jury's verdict on the charge of first-degree rape. *Id.* The admission of the victim's testimony did not constitute plain error. This assignment of error is overruled.

## VII. Defendant's Prior Bad Acts

**[5]** Defendant argues the trial court committed plain error when it "admitted . . . Bacon's 'other crimes' character evidence about defendant's prior incarceration, drug use, and non-sexual physical assault of [the victim] into evidence . . . ." We disagree.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2005) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

During the State's direct examination of Bacon, she disclosed the following facts: (1) defendant was previously incarcerated; (2) defendant used marijuana while he lived with Bacon and the victim; and (3) she walked in on defendant "whooping" the victim with a belt and thought it might have been because the victim "us[ed] the bathroom on the bed or on herself or something."

After the State presented its case, defendant took the stand to testify on his own behalf. Defendant stated during his direct examination that he sold drugs to help out around the house, "got busted[,]" and was incarcerated first for "six to nine months" and then for "111 days." The following exchange occurred during the State's cross-examination of defendant:

Q [Defendant], what have you been tried and convicted of in the last ten years that carries a jail sentence of 60 days or more?

A Drugs.

Q Possession with intent to sell and deliver marijuana October of '01?

A Yeah.

Q Anything else?

A Crack.

Q Possession with intent to sell and deliver cocaine August of '04?

A Yeah.

Q Anything else?

A Some more crack.

Q Some more crack?

A Yeah.

Q Anything else?

A No.

Q Assault on a female maybe in May of 2002?

A Yeah, yeah.

Q Larceny in 2000?

A Yeah.

The trial court erred when it admitted Bacon's testimony that defendant was previously incarcerated and used marijuana while living with Bacon and the victim. This evidence was admitted before defendant placed his credibility at issue by testifying. *See State v. Norkett*, 269 N.C. 679, 681, 153 S.E.2d 362, 363 (1967) ("[The][d]efendant testified, but did not otherwise put his character in issue. For purposes of impeachment, he was subject to cross-examination as to convictions for unrelated prior criminal offenses."). Nonetheless, in light of the other similar evidence properly admitted at trial, we are not "convinced that absent the error the jury probably would have reached a different verdict." *Walker*, 316 N.C. at 39, 340 S.E.2d at 83.

The trial court properly admitted Bacon's testimony regarding the "whooping" incident. The State's evidence tended to show that the victim began "wetting the bed" around the time of the alleged sexual abuse. Bacon's testimony about the "whooping" incident therefore tended to establish defendant's intent to conceal the alleged sexual abuse. The trial court properly admitted this testimony pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b). This assignment of error is overruled.

## VIII. Ineffective Assistance of Counsel

[6] Defendant argues he received ineffective assistance of counsel and is entitled to a new trial.

A defendant's ineffective assistance of counsel claim may be brought on direct review "when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." If an ineffective assistance of counsel claim is prematurely brought, this Court may dismiss the claim without prejudice, allowing the defendant to reassert the claim during a subsequent motion for appropriate relief proceeding.

*State v. Pulley*, 180 N.C. App. 54, 69, 636 S.E.2d 231, 242 (2006) (citations omitted), *disc. review denied*, 361 N.C. 574, 651 S.E.2d 375 (2007). "Simply stated, the trial court is in a better position to determine whether a counsel's performance: (1) was deficient so as to deprive defendant of ' "counsel" ' guaranteed under the Sixth Amendment; and (2) prejudiced defendant's defense to such an extent that the trial was unfair and the result unreliable." *State v. Duncan*, 188 N.C. App. 508, 517, 656 S.E.2d 597, 603 (Hunter, J., dissenting), *disc. review improvidently allowed, reversed*, 362 N.C. 665, 669 S.E.2d 738 (2008) ("For the reasons stated in the dissenting opinion of the Court of Appeals, the decision of the Court of Appeals is reversed[.]").

Here, defendant's alleged errors relate to his counsel's failure to object at trial. Under *Pulley*, the proper action is to dismiss this assignment of error without prejudice, allowing defendant to file a motion for appropriate relief with the trial court. The trial court is in the best position to review defendant's counsel's performance.

## IX. Resentencing

[7] In *State v. Stonestreet*, our Supreme Court stated:

Where two or more indictments or counts are consolidated for the purpose of judgment, and a single judgment is pronounced thereon, even though the plea of guilty or conviction on one is sufficient to support the judgment and the trial thereon is free from error, the award of a new trial on the other indictment(s) or count(s) requires that the cause be remanded for proper judgment on the valid count. 243 N.C. 28, 31, 89 S.E.2d 734, 737 (1955).

Here, the trial court consolidated defendant's convictions for first-degree sexual offense and first-degree rape. We have awarded defendant a new trial on the charge of first-degree sexual offense

and found there to be no error in defendant's first-degree rape conviction. Based on our Supreme Court's holding in *Stonestreet*, this cause is remanded for resentencing on defendant's first-degree rape conviction.

## X. Conclusion

For the foregoing reasons, we award defendant a new trial on the charge of first-degree sexual offense, hold there to be no error in his first-degree rape conviction, and remand for resentencing on the first-degree rape conviction.

No error in part; new trial in part; and remanded for resentencing.

Judges McGEE and JACKSON concur.