An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-897

NORTH CAROLINA COURT OF APPEALS

Filed:  20 May 2014

STATE OF NORTH CAROLINA

v.

JASON RICHARD CHAPIN

Wake County
Nos. 10 CRS 201603-04

Appeal by defendant from judgments entered 11 September 2012 by Judge Paul C. Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 8 January 2014.

*Roy Cooper, Attorney General, by Anne M. Middleton, Assistant Attorney General, for the State.*

*Cheshire Parker Schneider & Bryan, PLLC, by John Keating Wiles, for defendant-appellant.*

DAVIS, Judge.

Jason Richard Chapin ("Defendant") appeals from his convictions of various sex offenses.  On appeal, Defendant contends that the trial court (1) committed plain error by allowing the introduction of testimony regarding his viewing of pornography; (2) committed plain error by permitting the prosecutor to ask a witness if her testimony was truthful; and

(3) improperly denied his trial counsel's request for a modified jury instruction. After careful review, we conclude that Defendant received a fair trial free from prejudicial error.

**Factual Background**

The State presented evidence at trial tending to establish the following facts: Sally[1], Defendant's daughter, was born on 7 November 1996 and was fifteen at the time of trial. Defendant was married to Sally's mother, Melissa Vestal ("Ms. Vestal"), for several years before separating when Sally was seven years old.

After Sally's parents divorced, her mother married David Vestal. After the divorce, Sally went to live with her mother and stepfather along with her brother, two stepsiblings, and two half-siblings. However, Sally did not enjoy living with her mother and preferred living with Defendant because she and Defendant would "hang out, go to the gym, [and] go out to eat." Conversely, Sally and her mother had a strained relationship.

Sally began to live with Defendant at the time she was entering into adolescence. Over time, Defendant began changing their parent-child relationship into a sexual relationship. On

---

[1] Pseudonyms are used throughout this opinion to protect the identities of individuals who were minors at the time of the incidents described herein.

occasion, Defendant took her shopping at Victoria's Secret. While at the store, she would pick out certain bras and underwear and upon returning home would model them for Defendant at his request. Defendant also gave Sally several thongs and corsets that belonged to one of his girlfriends. Sally would model those items for Defendant as well. Defendant would sometimes tell Sally that they did not have a "normal father-daughter relationship."

A number of other incidents occurred that made Sally feel increasingly uncomfortable around Defendant. On one occasion, Sally needed to use a printer to print a document for school. She "went on [Defendant's] computer because he told [her] to get on it." When Sally went to use the computer, she saw pornographic images that were "already up," displaying images of "girls and guys having sex and girls and girls."

On several occasions, Defendant shaved Sally's legs and vaginal area. The first such incident occurred when Sally, Defendant, and Defendant's girlfriend were getting ready to leave their residence to attend a wedding. Defendant told Sally that she needed to shave her legs, and Defendant's girlfriend tried to show Sally how to do so by letting Sally observe her shaving her own legs. However, Defendant became angry because

they were running late and made Sally put her legs on the toilet so he could shave them himself.

The next shaving incident occurred after Defendant and his girlfriend had separated. Sally was in the shower and called out for Defendant to bring her a razor. Defendant brought Sally a razor, looked at her legs and vaginal area, and stated: "[W]ow, that's really hairy. That's gross." He left the shower briefly and returned wearing a bathing suit. He then entered the shower and shaved her legs and vaginal area. Similar incidents occurred during the latter part of Sally's sixth grade year.

On another occasion, Sally returned home from the gym and was waiting to take a shower before she and Defendant went out to dinner. Defendant told Sally to use his shower and that it would be faster if the two rinsed off together. Sally and Defendant then proceeded to shower together.

When Sally was in the seventh grade, Defendant began coming into her room and touching her body in inappropriate places. Sally described an incident when she was lying down in her bed but was unable to sleep. Defendant came into her room to lay down beside her. While Defendant was lying next to her, he rubbed cocoa butter on her breasts, took off her pants and

underwear, and proceeded to "hump on top of [her]," rubbing his penis against her while his pants were off. Sally pretended to be asleep during this incident.

Similar conduct by Defendant occurred "like once a week, then twice a week and then three times a week," including two instances during which Defendant digitally penetrated Sally's vagina. The sexual activity was not just confined to Sally's bedroom; it also occurred in Defendant's bedroom and on the couch.

At some point, Sally confided in a friend from school, "Lee," in general terms about Defendant's sexual abuse of her. However, she never told Lee any specific details about Defendant's conduct and asked that Lee not repeat anything she said to others.

On 11 December 2009, Sally was confronted at her school by two employees from the Child Protective Services Division ("CPS") within Wake County Human Services. They asked Sally "if anyone had given her a private touch or a bad touch." Sally at first denied any improper conduct by Defendant. However, she ultimately admitted that Defendant had sexually abused her and provided a written statement, detailing the sexual acts he had

performed on her. At that point, Sally went to live with her mother and was not allowed any further contact with Defendant.

On 19 January 2010, a warrant was issued for Defendant's arrest. Defendant was indicted and charged with seven counts of indecent liberties with a child; two counts of sexual offense of a person who is 13, 14, or 15; and two counts of attempted first-degree rape. A jury trial was held in Wake County Superior Court in July 2011. The jury found Defendant not guilty on the two counts charging attempted first-degree rape. However, because the jury could not reach verdicts on the remaining charges, the court declared a mistrial. A second jury trial took place in Wake County Superior Court on 4 September 2012.

During trial, Rosalie Bealer ("Ms. Bealer"), a CPS worker employed by Wake County Human Services, testified about her investigation of Sally's abuse allegations. She stated that during her interview of Ms. Vestal, Sally's mother had remembered an incident involving her sister, Rebecca Allen ("Ms. Allen"), in which Defendant had inappropriately touched Ms. Allen while she was asleep. Ms. Bealer interviewed Ms. Allen who related an incident that had occurred when Ms. Allen was seventeen years old and staying at Defendant's house. On this

occasion, Defendant "took his finger and rubbed [Ms. Allen's] vagina." She stated to Ms. Bealer that when she "asked him what are you doing . . . he ran to the bathroom and said I'm sorry."

The State's final witness, Christine Adams ("Ms. Adams"), testified about her own relationship with Defendant. She stated that on 10 April 2010 she and Defendant became romantically involved and later became engaged. However, their relationship soured, and they eventually separated. Ms. Adams testified that "I think he looked at [Sally] like a girlfriend and not, you know, I think he was obsessed with her like he was with Melissa or me . . . ." At the close of her direct examination, she was asked by the prosecutor if her testimony was true and she answered: "Yes."

At the close of the State's evidence, the trial court dismissed one of the first-degree sexual offense charges. The jury found Defendant guilty of one count of first-degree sexual offense with a child under 13; two counts of first-degree sexual offense with a child 13, 14, or 15 years of age; and seven counts of taking indecent liberties with a child. The trial court sentenced Defendant to a presumptive range term of 192 to 240 months imprisonment for one count of first-degree sexual offense, consolidated the remaining offenses, and sentenced

Defendant to a consecutive presumptive range term of 192 to 240 months imprisonment. In addition, Defendant was ordered to register as a sex offender and be subject to satellite-based monitoring for life. Defendant gave notice of appeal in open court.

**Analysis**

## I. Testimony Regarding Defendant's Viewing of Pornography

Defendant first contends that the trial court erred when it "repeatedly allowed and failed to strike on its own motion testimony about [Defendant's] viewing of pornography when the conduct he was accused of had nothing to do with the viewing of pornography." At the outset, we note that Defendant did not object to the admission of this evidence at trial. Accordingly, we review this argument only for plain error. N.C.R. App. P. 10(a)(4). To successfully establish plain error, a "defendant must demonstrate that a fundamental error occurred at trial" — meaning that the error was such that it "had a probable impact on the jury's finding that the defendant was guilty." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation and quotation marks omitted).

"The admissibility of evidence is governed by a threshold inquiry into its relevance. In order to be relevant, the

evidence must have a logical tendency to prove any fact that is of consequence in the case being litigated." *State v. Griffin*, 136 N.C. App. 531, 550, 525 S.E.2d 793, 806 (citation and quotation marks omitted), *appeal dismissed and disc. review denied*, 351 N.C. 644, 543 S.E.2d 877 (2000). It is well settled that in a criminal case, any evidence which sheds light upon the alleged crime is admissible. *State v. Streckfuss*, 171 N.C. App. 81, 88, 614 S.E.2d 323, 327 (2005). Moreover, evidence meets the test of relevancy if it has any logical tendency, however slight, to prove a fact in issue. *State v. Lloyd*, 187 N.C. App. 174, 177, 652 S.E.2d 299, 301 (2007), *cert. denied*, 363 N.C. 586, 683 S.E.2d 214 (2009).

Here, Sally testified that Defendant told her to use his computer at a time when pornography was displayed on the screen. At trial, Defendant offered the testimony of Dr. H.D. Kilpatrick ("Dr. Kilpatrick"), an expert in forensic psychology. Dr. Kilpatrick reviewed the information pertaining to the allegations of sexual abuse by Defendant using a multiple hypothesis method. He testified that events such as modeling lingerie and cuddling were concerning because they were potentially grooming activities — used to set the child up for a sexual relationship.

Sally's testimony raised the inference that Defendant knowingly let her view pornography on his computer, conduct that was consistent with the type of grooming activities described by Dr. Kilpatrick and, therefore, relevant to the charges against him. In addition, the evidence was also arguably relevant to show Defendant's "preparation and plan to engage in sexual [acts] with her and assist in the preparation and plan by making [her] aware of such sexual conduct and arousing her." *State v. Williams*, 318 N.C. 624, 632, 350 S.E.2d 353, 358 (1986) (holding that daughter's presence at an x-rated film at defendant's insistence, coupled with his comments, showed his plan and preparation to engage in a sexual relationship with her).

Defendant relies on *State v. Bush*, 164 N.C. App. 254, 595 S.E.2d 715 (2004), in support of his argument that "the only thing that the evidence of the pornography in [Defendant's] trial accomplished was to put his character in a bad light." In *Bush*, the defendant was charged with first-degree sexual assault with a minor. At trial, the State offered evidence that after the sexual incident occurred, the defendant brought a pornographic video into the home but did not offer any evidence that it was viewed by the minor or used to seduce the minor. *Id*. at 261, 595 S.E.2d at 719. This Court held that evidence of

defendant's "possession of pornographic materials, without any evidence that defendant had *viewed* the pornographic materials with the victim, or any evidence that defendant had asked the victim to look at the pornographic materials . . . was not relevant to proving defendant committed the alleged offenses in the instant case and should not have been admitted by the court."  *Id*. at 262, 595 S.E.2d at 720 (citations and quotation marks omitted and emphasis added).

The present case is distinguishable because here, unlike in *Bush*, Sally actually saw the pornography on Defendant's computer.  Sally testified:

> Q. And do you recall what was happening in the
> porn site that you could see?
>
> A. Just like everything.
>
> Q. Help us understand what you mean by "everything."
>
> A. Like girls and guys having sex and girls and girls. Just stuff like that.
>
> Q. Did you have to click on like -- did you have to navigate to that or when you went to the computer it was just there?
>
> A. It was already up.

Therefore, because in this case the victim actually saw the pornography under circumstances permitting the inference that

Defendant intended for her to view it and become aroused by it, the admission of this evidence was not error at all — much less plain error.

## II. Admission of Testimony That Witness Was Telling the Truth

Defendant next contends that the trial court committed plain error when it admitted the following testimony of Ms. Adams:

> Q. And this testimony that you're giving here today, is it true to the best of your knowledge?
>
> A. Yes.

Because Defendant did not object to this testimony at trial, he — once again — bears the burden of showing that the admission of this evidence constituted plain error.

> The question of whether a witness is telling the truth is a question of credibility and is a matter for the jury alone. Therefore . . . it is improper for . . . counsel to ask a witness (who has already sworn an oath to tell the truth) whether he has in fact spoken the truth during his testimony.

State v. Streater, 197 N.C. App. 632, 645, 678 S.E.2d 367, 376, disc. rev. denied, 363 N.C. 661, 687 S.E.2d 293 (2009) (citations and quotation marks omitted).

In Streater, the defendant was convicted of several offenses stemming from his act of sexual intercourse with a

four-year-old girl.  On appeal, the defendant argued that the court had committed plain error by allowing the victim to testify as to her own truthfulness.  *Id.* at 639, 678 S.E.2d at 372.  This Court held that the trial court erred when it allowed the victim to testify that she "told the truth" in response to the prosecutor's questions on direct examination.  *Id.* at 645, 678 S.E.2d at 376.  However, we ruled that such error did not rise to the level of plain error in light of the "physical evidence of vaginal penetration presented . . . and the victim's prior consistent statements."  *Id.* at 646, 678 S.E.2d at 376-77.

Here, we conclude that the trial court did err in allowing the admission of Ms. Adams' answer to the prosecutor's question regarding the truthfulness of her testimony.  However, we do not believe that this error rose to the level of plain error.  The State presented evidence of Defendant engaging in sexual activity with Sally for a period of years starting when Sally was under the age of thirteen.  Sally testified as to multiple occurrences of sexual abuse inflicted on her by Defendant during this time, including instances in which he (1) rubbed her breasts and vagina and then took off her clothes and "started to hump [her]"; (2) penetrated her vagina with his finger; and (3) shaved her legs and vaginal area while showering.  In light of

this overwhelming evidence of guilt, any error in the admission of this testimony was not so fundamental that it had a probable impact on the jury's finding that the Defendant was guilty. Accordingly, he has failed to show plain error.

## III. Jury Instructions

At trial, Defendant's counsel raised the following concern as to the proposed jury instruction on "Evidence of Similar Acts or Crimes" as it related to Ms. Bealer's testimony regarding the information Ms. Allen had related to her during her interview:

> That evidence relates to Rebecca Allen, who was not a witness to this trial, so I think in fairness, your Honor, we either have to qualify that evidence as hearsay evidence that's been received or offer some instruction with regard to my inability to cross-examine her.

This portion of the jury instruction — as ultimately given by the trial court — stated as follows:

> Evidence has been received tending to show that the defendant touched the genital area of Rebecca Allen, who was seventeen years old at the time, while she was a house guest of the defendant and his [w]ife. This evidence was received solely for the purposes of showing that there existed in the mind of the defendant a planned scheme, system, or design involving the crimes - charged in this case, the absence of mistake, the absence of accident. If you believe this evidence you may consider it but only for the limited purpose for which it was received. You may not consider it

> for any other purpose.
>
> You may find that a witness is interested in the outcome of this trial. You may take the witness's interest into account in deciding whether to believe the witness. If you believe the testimony of the witness in whole or part you should treat what you believe the same as any other believable evidence.

Defense counsel requested that the trial court add the word "hearsay" prior to the word "evidence" in this portion of the instruction. The court declined to make the requested modification, noting that the testimony at issue had been received without objection and that it was aware of no basis for instructing the jury in the manner requested by Defendant. We agree with the trial court's reasoning.

Defendant was free to object to the alleged hearsay evidence at the time it was introduced by the State but failed to do so. He likewise failed to request a limiting instruction at the time the evidence was introduced that would have informed the jury that this evidence could be considered only for a specified limited purpose. "The admission of evidence, competent for a restricted purpose, will not be held error in the absence of a request by defendant for a limiting instruction." *State v. Chandler*, 324 N.C. 172, 182, 376 S.E.2d 728, 735 (1989)

Defendant has failed to cite any caselaw supporting his novel argument that the jury should have been instructed that the evidence was "hearsay evidence" under these circumstances. Nor has our own independent research disclosed any case in which North Carolina courts have required a trial court to give such a modified jury instruction under analogous circumstances. This argument is, therefore, overruled.[2]

## Conclusion

For the reasons stated above, we conclude that Defendant received a fair trial free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges STEELMAN and STEPHENS concur.

Report per Rule 30(e).

---

[2] Defendant also asserts that his rights under the Confrontation Clause were violated by the admission of the out-of-court statement of Ms. Allen. However, it is well settled that constitutional issues "not raised and passed upon at trial will not be considered for the first time on appeal." *State v. Garcia*, 358 N.C. 382, 415, 597 S.E.2d 724, 748 (2004). Defendant did not raise his Confrontation Clause argument at trial. Therefore, he has failed to preserve this issue for appellate review. *See State v. Flippen,* 349 N.C. 264, 276, 506 S.E.2d 702, 709-10 (1998) (holding that defendant's failure to raise constitutional issue at trial waived appellate review of that issue, *cert. denied*, 526 U.S. 1135, 143 L.Ed.2d 1015 (1999).