McCULLOUGH, Judge.
*562 Daniel Tejeda Chavez ("defendant") appeals from judgments entered upon his convictions for indecent liberties with a child (11 CRS 57861) in violation of N.C. Gen.Stat. § 14-202.1, statutory rape of a person 13, 14, or 15 years old (11 CRS 58157) in violation of N.C. Gen.Stat. § 14-27.7A(a), and statutory *110 sex offense of a person 13, 14, or 15 years old (12 CRS 1837) in violation of N.C. Gen.Stat. § 14-27.7A(a). For the following reasons, we find no error. *563 I. Background
On 2 April 2012, a Davidson County Grand Jury indicted defendant on the following three charges that occurred between 13 May 2009 and 15 November 2011: one count of indecent liberties with a child, one count of statutory rape of person 13, 14, or 15 years old, and one count of statutory sex offense of person 13, 14, or 15 years old. Defendant pled not guilty and his case came on for trial in Davidson County Superior Court before the Honorable W. David Lee on 14 April 2014.
At trial, the State's evidence tended to show the following: Defendant began a relationship with Amanda Balderas ("Amanda") around the year 2005. Shortly thereafter, Amanda, along with two of her daughters, Ava and Helen, moved into defendant's home in Thomasville, North Carolina.[1] At that time, Ava was seven years old and Helen was five years old. In 2007, defendant and Amanda gave birth to their own child, Lisa.
Ava's testimony revealed that when she was approximately ten or eleven years old, defendant began to "touch" her. Defendant began touching her leg and progressed to touching her breasts. Ava testified the touching "got worse" as she got older. When Ava was approximately thirteen or fourteen years old, defendant began touching her "everywhere," including her breasts, bottom, and vagina. The defendant would take Ava into his bedroom, undress her, and "play" with her vagina and breasts. Defendant put his hands inside and outside of Ava's vagina, and eventually engaged in sexual intercourse. Ava testified that the sexual intercourse "happened multiple times; I couldn't count." However, Ava told a forensic interviewer that defendant "had touched her body more than 50 times and had sex with her more than 30." Ava told defendant to stop "once or twice," but was reluctant to tell him to stop every time because she was scared of being hurt by defendant. Ava testified that she became "really depressed" from the things defendant was doing to her, and began "cutting" herself.
On 13 November 2011, Ava went to her grandmother's house after getting into an argument with Amanda and defendant. Two days later, when her grandmother encouraged Ava to go back home, Ava began crying. Her grandmother asked Ava why she did not want to return home and Ava "told her everything that was going on." Specifically, Ava told her grandmother she was "tired of being molested," "tired of being put down," and tired of being "treated like a maid or a toy." After telling her *564 grandmother about the abuse, the police were called, and Ava was taken to the Thomasville Police Department.
Ava's grandmother then called Amanda and asked where she was. Amanda responded that she was grocery shopping with defendant and her other two daughters, Helen and Lisa. Amanda testified that when they exited the grocery store, they were surrounded by police officers. Officers told defendant to take the groceries home, but Amanda, Helen, and Lisa were escorted to the police station where Amanda was first made aware of Ava's sexual abuse allegations against defendant. One of the police officers told Amanda to go home and pack some clothes because she could no longer stay at defendant's house.
In the meantime, defendant took the groceries home and then drove to the police station where he was interviewed by Detective Foley and Corporal Truell for approximately 30 minutes. When Detective Foley explained to defendant that Ava had made some allegations against him, defendant responded that Ava "had been coming on to him." Detective Foley testified that during the interview, defendant admitted to performing oral sex on Ava "for about three minutes" three months earlier. Detective Foley transcribed defendant's confession in a printed document. Before leaving the police station, defendant read his statement aloud and then signed and initialed the document. Defendant was then taken home by Corporal Truell around midnight.
*111 Amanda was already at the house when defendant got home. She testified that defendant was "furious" and they began to argue. Defendant told Amanda that Ava "came on to him," and "it was her fault." Defendant then admitted to giving Ava oral sex after he came out of the bathroom and Ava was lying naked on the bed. Amanda testified that defendant stated, "Get a butcher knife. Kill me now. I will get it from the kitchen, just go ahead." Amanda then left the house with some of her belongings after being there for approximately 30 to 45 minutes. Shortly thereafter, at approximately 2 a.m. on 16 November 2011, Corporal Truell returned to defendant's home with a warrant for defendant's arrest and arrested defendant for indecent liberties with a child.
On 22 November 2011, Ava was physically examined by Dr. Sarah Sinal ("Dr. Sinal"). Dr. Sinal testified as an expert in "child evaluation and evaluation of sexual or physical abuse." Dr. Sinal explained that she first obtained Ava's medical history from Ava's mother, which is when she was made aware that Ava had been "cutting herself." "Cutting behavior" was significant to Dr. Sinal because "cutting, unfortunately, is a very common behavior seen in children who have been abused and frequently sexually abused."
*565 Dr. Sinal then performed a genital examination of Ava. The exam revealed that Ava had less hymen tissue at the 6:00 o'clock position, but otherwise, examination of Ava's hymen was considered "normal." Dr. Sinal clarified that for a genital exam to be considered abnormal, the hymen tissue would have to be completely absent at the 6:00 position. Completely absent hymen tissue suggests a significant injury to the hymen, typically caused by a penetrating object, such as a penis. Dr. Sinal testified that Ava's normal exam was not surprising. She further testified that 95 percent of children examined for sexual abuse have normal exams, explaining that "it's more of a surprise when we do find something." Dr. Sinal opined that a normal exam with little to no signs of penetrating injury could be explained by the "stretchy" nature of the hymen tissue and its ability to heal quickly. For example, deep tears to the hymen can often heal within three to four months, while superficial tears can heal within a few days to a few weeks.
After the State presented its case, defendant's primary source of evidence came from his own testimony. Defendant testified that when he arrived at the police station on 15 November 2011, Detective Foley told him that he had been accused of having sex and oral sex with Ava. Defendant testified that he denied all sexual abuse allegations. In regard to the printed confession, defendant suggested he did not understand it and asked the officers for a translator. Defendant testified that officers told him they would "bring the polygraph machine and call immigration" if a translator had to be called. Defendant then signed the written statement and was taken home.
Defendant testified that he and Amanda talked for approximately ten minutes when he got home. Defendant further testified that he never admitted to performing oral sex on Ava, nor did he make any statement about getting a knife from the kitchen.
Defendant believes that Ava made up the sexual abuse allegations due to the behavioral problems Ava had with Amanda, along with the issues defendant had experienced with Ava's boyfriend. Defendant explained that Ava's boyfriend was transferred to a different school after defendant found sexual letters and inappropriate text messages exchanged between Ava and her boyfriend. Defendant testified that they "took everything away," including Ava's phone, nose ring, and allowance. Defendant further testified that Ava was "mad at the world" and resented Amanda and him.
The case was given to the jury on 17 April 2014. Later that afternoon, the jury returned verdicts finding defendant guilty of all charges. The *566 trial court then entered judgments. In the first judgment, the trial court sentenced defendant to a term of 192 to 240 months for statutory rape. In the second judgment, the trial court consolidated the indecent liberties with a child and statutory sex offense convictions and sentenced defendant to a consecutive term of 192 to 240 months. In addition, upon release from imprisonment, defendant will be required to *112 register as a sex offender, enroll in satellite-based monitoring, and will be subject to a permanent no contact order prohibiting contact with Ava. Defendant gave notice of appeal in open court.
II. Discussion
On appeal, defendant raises issue with the following two portions of Dr. Sinal's testimony: First, Dr. Sinal testified about Ava's cutting behavior, noting that such behavior is very common among sexually abused children. Second, in regard to the results of Ava's genital examination, Dr. Sinal testified that she was not surprised that Ava's exam was normal. Dr. Sinal opined that 95 percent of children examined for sexual abuse have normal exams and it is more of a surprise when there is evidence of a penetrating injury. Defendant argues that the trial court erred in allowing these two portions of Dr. Sinal's testimony because absent any physical evidence of sexual abuse or of the cutting behavior, such testimony is irrelevant and constitutes impermissible bolstering of the victim's credibility. In other words, although Ava's medical exam revealed little to no evidence of sexual abuse, defendant contends Dr. Sinal's testimony suggested that the victim's allegations of sexual abuse were still believable. We disagree.
Standard of Review
Defendant did not object to Dr. Sinal's testimony at trial. However, on appeal, defendant now contends the trial court plainly erred in allowing Dr. Sinal to testify about her results and opinions regarding the physical examination of the victim.
In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.
N.C. R.App. P. 10(a)(4) (2015).
For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show *567 that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]
State v. Lawrence, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations and quotation marks omitted.)
Analysis
In support of his argument that the trial court erred in allowing Dr. Sinal's testimony, defendant cites multiple cases. All of defendant's cited cases, however, are inapplicable to the facts of the present case.
Defendant first cites State v. Grover, 142 N.C.App. 411, 543 S.E.2d 179 (2001), in which this Court held that absent physical evidence of sexual abuse, expert testimony that such abuse had in fact occurred was inadmissible because it bolstered the veracity of complainant's testimony. Grover, 142 N.C.App. at 421, 543 S.E.2d at 185. Defendant compares the present case to Grover, arguing that although Dr. Sinal did not, per se, testify that Ava had been sexually abused, her testimony that the lack of physical evidence was not surprising amounted to a confirmation of Ava's allegations of sexual abuse.
Defendant is correct in that this Court has consistently held that where "experts [find] no clinical evidence that would support a diagnosis of sexual abuse," an expert may not testify that sexual abuse had in fact occurred because such an opinion "merely attest[s] to the truthfulness of the child witness," and is inadmissible. Grover, 142 N.C.App. at 413, 543 S.E.2d at 181 (quoting State v. Dick, 126 N.C.App. 312, 315, 485 S.E.2d 88, 90 (1997) ).
In the present case, however, Dr. Sinal never testified that sexual abuse had in fact occurred, nor did Dr. Sinal make a diagnosis or provide an opinion that Ava had been sexually abused. Dr. Sinal's testimony that the lack of physical evidence was not surprising cannot be equated with a statement that Ava had in fact been abused. Because Dr. *113 Sinal did not testify that such abuse had in fact occurred, the present case is distinguishable and renders Grover inapplicable.
Defendant next cites State v. Streater, 197 N.C.App. 632, 678 S.E.2d 367 (2009), for the holding that where there is no physical evidence of penetration, the trial court errs by allowing a doctor to testify *568 that findings from a physical examination are consistent with the victim's report of repeated penetration because the testimony amounts to improper opinion on the victim's credibility. Based on his interpretation of Streater , defendant contends the trial court erred in allowing Dr. Sinal's testimony in this case.
Upon review, we disagree with defendant's reliance on Streater for two reasons. First defendant misconstrues Streater . In Streater , this Court indicated "[the doctor] could testify that the physical findings[, or lack thereof,] could be present even where there was repeated penetration, but it is the specific identification of defendant as perpetrator which crosses over the line into impermissible testimony." 197 N.C.App. at 642, 678 S.E.2d at 374. This Court then held "[t]he trial court therefore erred when it admitted [the doctor's] testimony that his findings were consistent with 'the history that he received from the victim' " of repeated anal penetration by the defendant . Id. (alteration in original omitted) (emphasis added). Second, unlike the doctor in Streater , Dr. Sinal never testified that Ava's normal physical exam: i.e., her lack of physical evidence to indicate a penetrating injury, was consistent or inconsistent with Ava's disclosure of penal penetration. Dr. Sinal simply testified that Ava's normal exam was not surprising and that 95 percent of children examined for sexual abuse have normal exams. Therefore, this case is distinguishable and Streater is inapplicable to the present facts.
Defendant also cites State v. O'Connor, 150 N.C.App. 710, 564 S.E.2d 296 (2002) and State v. Aguallo, 318 N.C. 590, 350 S.E.2d 76 (1986), in which the defendants were granted new trials after the trial courts erred in allowing impermissible expert testimony. Specifically, a doctor testified in both cases, claiming the child's disclosure of sexual abuse was "credible" or "believable." O'Connor, 150 N.C.App. at 711, 564 S.E.2d at 297 ; Aguallo, 318 N.C. at 591, 350 S.E.2d at 77.
Again, defendant is correct that this Court has held that "testimony of an expert to the effect that a prosecuting witness is believable, credible, or telling the truth is inadmissible evidence." State v. Bailey, 89 N.C.App. 212, 219, 365 S.E.2d 651, 655 (1988). However, in the present case Dr. Sinal never opined, nor was she asked to opine, about the believability of Ava. Dr. Sinal never testified that Ava was a credible witness or that Ava's disclosure of abuse was believable, thus distinguishing the present case from Aguallo and O'Connor.
In addition, an expert witness is entitled to testify, "upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent *569 therewith." State v. Stancil, 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002). Therefore, testimony that cutting behavior is very common among sexually abused children or that 95 percent of children examined for sexual abuse have normal exams is permissible testimony.
Dr. Sinal never testified that Ava was "in fact abused", that Ava was "believable" or "credible", or that Ava's disclosure was "consistent with" her normal exam, despite a lack of physical evidence. Therefore, the cases cited by the defendant are inapplicable to the facts of the present case.
Moreover, upon review of the record, it is clear to this Court that defendant only considers narrow portions of Dr. Sinal's testimony and ignores the context in which the testimony was offered.
One of the underlying issues that Dr. Sinal explained to the jury was how the passing of time can be responsible for the lack of vaginal evidence indicative of sexual abuse. When Dr. Sinal testified that it is more surprising when a genital exam shows trauma to the hymen, she based this statement on the "stretchy" nature of the hymen and its ability to heal quickly. She testified that a "petechia under the mucus membrane can disappear as soon as 12 hours." Deep *114 tears to the hymen can heal within three or four months, and superficial tears can heal within a few days to a few weeks. Therefore, an examination of a child's hymen whose rape occurred weeks or months prior to her exam is less likely to reveal evidence of sexual abuse.
Dr. Sinal performed Ava's genital examination on 21 November 2011, almost a full week after the last possible occurrence of sexual abuse alleged in defendant's indictment. Her testimony was relevant not only to help the jury understand the results of her examination, but also to demonstrate that a lack of physical evidence of sexual abuse does not preclude sexual abuse when there is a passing of time between the alleged incidents and the physical examination. See N.C. Gen.Stat. § 8C-1, Rule 401 (2013) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").
Lastly, this case does not hinge solely on the testimony of Dr. Sinal. Defendant made admissions on multiple occasions tending to show his guilt. Thus, even assuming arguendo that Dr. Sinal's testimony was error, given the overwhelming evidence against defendant, we hold the alleged error does not amount to plain error requiring a new trial.
*570 III. Conclusion
For the reasons discussed above, we hold the alleged error does not amount to error, much less plain error. Therefore, defendant is not entitled to a new trial.
NO ERROR.
Judges CALABRIA and DIETZ concur.

Pseudonyms are used to protect the identities of the minors.